UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAHESH PATEL, ROBERT HARVEY, HARPREET WASAN, STEVEN HOUGHTALING, TOM EDWARDS, and GARY PRUS. | No. 3:21-cr-220 (VAB) |

**RULING AND ORDER ON DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL**

The United States of America (the "Government") has charged Mahesh Patel ("Mr. Patel"), Robert Harvey ("Mr. Harvey"), Harpreet Wasan ("Mr. Wasan"), Steven Houghtaling ("Mr. Houghtaling"), Tom Edwards ("Mr. Edwards"), and Gary Prus ("Mr. Prus") (collectively, "Defendants") in a one-count Indictment with conspiracy in restraint of trade in violation of 15 U.S.C. § 1 (the "Sherman Act"). *See* Indictment, ECF No. 20 (Dec. 15, 2021) ("Indictment").

Defendants jointly filed a motion for judgment of acquittal, Defs.' Joint Mot. for J. of Acquittal, ECF No. 579 ("Mot."), and Mr. Wasan and Mr. Harvey separately filed a supplemental memorandum of law in support of the motion for judgment of acquittal, Mr. Harvey's and Mr. Wasan's Suppl. Mem. of Law in Supp. of Defs.' Joint Mot for J. of Acquittal, ECF No. 591 ("Suppl. Mot.").

On April 25, 2023, the Court heard oral argument on the pending motions, and subsequently issued an order permitting the Government to supplement its oral argument with a written submission. Order, ECF No. 591.

On April 26, 2023, the Government filed a written opposition to Defendants' motions. *See* Gov. Opp'n to Defs.' Rule 29 Mots., ECF No. 593 ("Opp'n").

1

On April 27, 2023, the Defendants filed a reply to the Government's opposition. Reply Mem. of Law in Supp. of Defs.' Joint Mot. for J. of Acquittal and Suppl. Mot. for Acquittal, ECF No. 595 ("Reply").

On April 27, 2023, the Government filed a sur-reply to Defendants' motions. Gov't's Surreply to Defs.' Rule 29 Mot., ECF No. 595 ("Sur-Reply").

Having considered all of the filings and the various arguments of the parties, for the following reasons, Defendants' joint motion for judgment of acquittal is **GRANTED**.

I.   FACTUAL AND PROCEDURAL BACKGROUND

The Court assumes the parties' familiarity with the factual and procedural background and therefore, the Court will only address the background issues relating to the pending motions. *See, e.g.*, Ruling and Order on Pretrial Mots. at 3–11, ECF No. 458; Ruling and Order on Mot. to Dismiss at 5–9, ECF No. 257 ("MTD Ruling").

On December 15, 2021, the Government charged Defendants in a sealed single-count Indictment alleging conspiracy in restraint of trade in violation of the Sherman Act. Indictment. Later unsealed, the Indictment alleges that Defendants "competed against one another to recruit and hire engineers and other skilled workers" and "knowingly entered into . . . [a] conspiracy . . . to suppress competition by allocating employees in the aerospace industry working on projects for Company A." Indictment ¶¶ 4, 19. More specifically, the Government alleged that Defendants agreed to "restrict the hiring and recruiting of engineers and other skilled-labor employees between and among Companies A–F." *Id.* ¶ 19. The Indictment then provides various specific examples of the alleged enforcement of the agreement. *See, e.g., id.* ¶¶ 20–29.

On June 29, 2022, Defendants filed a joint motion to dismiss the Indictment. *See* Defs.' Joint Mot. to Dismiss, ECF No. 174 ("Mot. to Dismiss"). Defendants argued, *inter alia*, that the

alleged no-poach agreement fell outside the "limited categories of conduct" that justify *per se* treatment, and that prosecuting the conduct alleged in the Indictment violated the Due Process Clause. *See id.* at 2–3. The Government argued, in response, that a no-poach agreement pleaded as a market allocation is properly subject to the *per se* rule. *See* Mem. in Opp'n to Mot. to Dismiss at 16–22, ECF No. 216 ("Opp'n to Mot. to Dismiss"). The Government further argued that procompetitive justifications are irrelevant to the motion to dismiss because the indictment properly pleads a *per se* illegal offense, and the Court had no pretrial obligation to consider a defendant's evidence of competitive effects in order to determine whether the Indictment properly charges a *per se* offense. *See id.* at 22–25.

Accepting these arguments and the facts pled in the Indictment—as it was required to do at that stage of the case—the Court denied the motion to dismiss. MTD Ruling. In doing so, the Court stated that: "While the no-poach agreement alleged in the Indictment does not qualify as a new category of restraint subject to *per se* treatment, the alleged conduct is subject to *per se* treatment because it is properly pled as a market allocation." *Id.* at 17. The Court also noted that "not all no poach agreements are market allocations subject to *per se* treatment and therefore, determining whether a no poach agreement is a market allocation is highly fact specific." *Id.* at 21. This holding was premised solely on the allegations in the Indictment. *Id.* at 22 ("[W]hile the alleged conduct may constitute a novel means of allocating a market, the *per se* rule still applies, at least in this instance, because the Government alleges Defendants allocated employees in a properly defined labor market." (citations omitted)). The case then proceeded to trial.

On April 24, 2023, the Government rested its case-in-chief. Tr. Vol. XIII at 3058:5–6.

On April 24, 2023, Defendants jointly filed a motion for judgment of acquittal based on several arguments. Mot. On April 25, 2023, Mr. Wasan and Mr. Harvey jointly filed a

supplemental memorandum of law in support of the joint motion for judgment of acquittal. Suppl. Mot.

On April 25, 2023, the Court held oral argument on the pending motions. Min. Entry, ECF No 592.

On April 25, 2023, after hearing arguments, the Court issued an order inviting the Government to file a written opposition to Defendants' motions. Order, ECF No. 591.

On April 26, 2023, the Government filed a written opposition to Defendants' motions. Opp'n.

On April 27, 2023, Defendants filed a reply in support of their motions for judgment of acquittal. Reply.

On April 27, 2023, the Government filed a sur-reply to Defendants' motions. Sur-Reply.

On April 27, 2023, Defendants filed a motion to strike the sur-reply. Defs.' Mot. to Strike Gov't Surreply, ECF No. 596. The Court denied the motion to strike on April 28, 2023. Order, ECF No. 597.

## II. STANDARD OF REVIEW

Under Federal Rule of Criminal Procedure 29, the court "on the defendant's motion" or "on its own" must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." When reviewing a motion for judgment of acquittal, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

"A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (alteration and internal quotation marks omitted) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)). A defendant challenging the sufficiency of the evidence thus "bears a heavy burden." *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003) (internal quotation marks omitted).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). Under this standard, the court "may not usurp the role of the jury by substituting its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quoting *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005)). A court must "defer to the jury[ the] assessment of witness credibility and . . . resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93–94 (2d Cir. 2000). In sum, "[t]he government's case need not exclude every possible hypothesis of innocence," *United States v. Martinez*, 54 F.3d 1040, 1042–43 (2d Cir. 1995) (internal quotation marks omitted), and where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter," *Guadagna*, 183 F.3d at 129 (alteration in original) (internal citation and quotation marks omitted).

At the same time, the Court is also mindful of its responsibility to protect Defendants' Fifth Amendment rights. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015). If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our

5

obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt." *Id.* at 515 (alteration in original) (quoting *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014)). In particular, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." *Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

### III.  DISCUSSION

#### A.  The Sherman Act

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States" violates Section 1 of the Sherman Act. 15 U.S.C. § 1. Section 1, despite its expansive language, "outlaw[s] only unreasonable restraints." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (alteration in original) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) ("[The Supreme] Court has long recognized that, '[i]n view of the common law and the law in this country' when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'") (second alteration in original) (quoting *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59–60 (1911))). In the civil context, courts analyze restraints of trade under either the *per se* rule or the rule of reason; the Department of Justice ("DOJ"), however, typically only criminally prosecutes *per se* restraints of trade. *See* U.S. DEP'T OF JUST., JUST. MANUAL at 7-2.200 (April 2022), available at https://www.justice.gov/jm/jm-7-2000-prior-approvals#7-2.200.

The *per se* rule recognizes that "[s]ome types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *Khan*, 522 U.S. at 10. The *per se* rule "is confined to restraints,"

such as price fixing, bid rigging, and market allocations, "that would always or almost always tend to restrict competition and decrease output." *Leegin*, 551 U.S. at 886 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)); *see also United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022).

The *per se* rule is applied and a criminal prosecution is warranted only if "courts have had considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886–87 (internal citations omitted); *see also United States v. Apple, Inc.*, 791 F.3d 290, 321 (2d Cir. 2015) (stating that the *per se* rule "reflect[s] a longstanding judgment that case-by-case analysis is unnecessary for certain practices that, by their nature[,] have a substantial potential to unreasonably restrain competition" (alterations in original) (internal citations and quotation marks omitted)). "[A] departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58–59 (1977).

The "*per se* approach permits categorical judgments with respect to certain business practices," *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985), such that these restraints are "unreasonable and therefore illegal" and do not require "elaborate inquiry as to the precise harm they have caused or the business excuse for their use," *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

Courts, however, "presumptively appl[y] rule of reason analysis," *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006), and "mere talismanic invocation of the term" market allocation "is [not] sufficient to bring the *per se* rule to bear on the actions of the alleged conspirators," *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 596 (S.D.N.Y. 1989). Indeed, in the Ruling and Order on

7

Defendants' motion to dismiss, the Court, citing binding Second Circuit law, held that not all no-poach agreements operate as market allocation agreements. MTD Ruling at 20–21 (citing *Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999)). The Court nonetheless found, based on the facts alleged in the Indictment, that the Government alleged an agreement "between competitors at the same level of the market structure" to allocate the labor market. *Id.* at 21–22 (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)).

Determining whether conduct should be analyzed under the *per se* or rule of reason framework is a question of law for the Court to decide. *United States v. Aiyer*, 33 F.4th 97, 113–14 (2d Cir. 2022); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 1909b (2018) (stating that "the selection of a mode [of antitrust analysis] is entirely a question of law" to be decided by a court). Once a court has made the determination that the *per se* rule applies, "if a defendant seeks to challenge the application of the *per se* rule to his offense conduct by arguing to the jury that such conduct fell within one of the exceptions to the *per se* rule, he would have had every right to make those arguments and present evidence on such exceptions at trial." *Aiyer*, 33 F.4th at 120.[1]

With these legal principles in mind, the Court will now address the parties' arguments.

---

[1] The Second Circuit in *Aiyer* found that the defendant's argument "that the district court erred in declining to assess his competitive effects evidence and refusing to make a threshold determination as to whether the *per se* rule or the rule of reason applied" was "procedurally and substantively flawed." 33 F.4th at 116. There, however, the defendant's argument was not based on evidence introduced at trial, but instead he argued that the district court should have "conduct[ed] a pre-trial assessment as to whether the *per se* rule or the rule of reason applie[d]." *Id.* at 106. There is no such argument here. The Court is not considering procompetitive benefits evidence and, indeed, at the motion *in limine* stage, the Court ruled that such evidence is not relevant. *See* Ruling and Order on Pretrial Mots. at 17–18, ECF No. 458. Moreover, the district court in *Aiyer* denied the defendant's motion for acquittal under Rule 29 because "there was sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that the defendant knowingly joined a conspiracy to fix prices and rig bids." *United States v. Aiyer*, 470 F. Supp. 3d 383, 409 (S.D.N.Y. 2020).

### B. Market Allocation

Horizontal market allocation agreements are traditionally subject to *per se* treatment under Section 1 of the Sherman Act. *Topco*, 405 U.S. at 608 (holding that the Court has "reiterated time and time again" that naked horizontal market allocation agreements are subject to *per se* treatment). A horizontal market allocation agreement is "an agreement between competitors at the same level of the market structure to allocate" a market in order "to minimize competition." *Id.* This can be accomplished by dividing geographic territory between competitors, *id.*, by "allocat[ing] or divid[ing] customers between competitors," *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273 (10th Cir. 2018), or by allocating or dividing an employment market, *see United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038–39 (N.D. Cal. 2013).

Defendants argue that the Government cannot prove the alleged agreement was one to "allocate employees in a specific labor market." Mot. at 21 (quoting Tr. Vol. IV at 706–07). More specifically, Defendants argue that the engineers who testified "further confirms the [G]overnment's inability to prove that there was an agreement to allocate a relevant labor market." *Id.* at 23. Defendants emphasize that each of the engineers who testified, except for one, were able to obtain new jobs in the aerospace industry, often at Pratt and Whitney. *Id.* In Defendants' view, the evidence "underscores that Pratt [and] Whitney and its outsourcing firms do not share a unitary labor market capable of ready allocation," which provides a "reason why the alleged restrictions at issue do not amount to a *per se* allocation of a relevant labor market." *Id.* at 24–25.

In response, the Government argues that, to prove a *per se* offense, it is not required to define the market because *per se* rules are designed to avoid "an incredibly complicated and

9

prolonged economic investigation," including "the enormous complexities of market definition." Opp'n at 7 (citing *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 430 (1990)). The Government also argues that, to the extent *Bogan v. Hodgkins* suggests that "it is an element of a *per se* case to describe the relevant market," this rule would apply specifically to the group boycott context. *Id.* at 8. Finally, as it relates to the applicability of *Bogan* to the facts at issue here, the Government argues that *Bogan* only briefly "rejected arguments that the agreement was a market-allocation agreement" and primarily assessed whether the agreement was a group boycott. *Id.* The Government emphasizes that the *Bogan* agreement was intrafirm, rather than interfirm. *Id.*

In reply, Defendants argue that the Government has not met its burden to prove the charged market allocation agreement existed because the evidence "does not permit a reasonable juror to find that the alleged agreement amounted to a naked, non-ancillary restraint." Reply at 2–3. Defendants emphasize that "following denials of motions to dismiss, and after discovery, courts" in the civil context "routinely determine that *per se* treatment is inappropriate and should not be submitted to a jury." *Id.* at 3–4. In Defendants' view, the evidence is does not provide a sufficient "basis for a reasonable jury to find that Defendants entered into the charged market allocation agreement." *Id.* at 4. Defendants also argue that "even if the [G]overnment had presented evidence sufficient for the jury to find that Defendants entered into a market allocation agreement . . . , it still would not be entitled to present its case to the jury on a *per se* theory of liability without proving that the alleged agreement was in fact a naked, non-ancillary one." *Id.* at 4.

The Court agrees.

As a matter of law, this case does not involve a market allocation under the *per se* rule. The Second Circuit's most recent treatment of a no hire agreement in *Bogan* is the starting point for the Court's analysis. There, Northwestern Mutual Insurance Company ("Northwestern Mutual") contracted General Agents to sell insurance and assigned five General Agents to share the New York Metropolitan area. *Bogan v. Nw. Mut. Life Ins. Co.*, 953 F. Supp. 532, 535 (S.D.N.Y.), *vacated on other grounds on reconsideration*, 30 F. Supp. 2d 610 (S.D.N.Y. 1997). The General Agents hired independent contractors as district and sales agents who were approved by Northwestern Mutual. *Id.*

The Bogans' Sherman Act claim was based on "an agreement among [Northwestern Mutual] General Agents not to compete for the services of existing agents by restricting their transfer." *Id.* at 538. The agreement, which was at first an oral understanding but later was included in a written contract, stated that "active [district and sales] agents could not transfer between General Agents without the permission of both the agent's former and future General Agent." *Id.* Additionally, the agreement "provided that agents who are terminated by a General Agency will not automatically be prevented from contracting with another General Agency" unless they were fired for cause. *Id.* (cleaned up). This agreement only applied to the sales and district agents working for the General Agents who shared the New York Metropolitan area. *Id.* at 535. The district court granted the defendants' motion for summary judgment after determining that the rule of reason applied. *Id.* at 543–550.

On appeal, the Bogans' argued the district court erred by not applying the *per se* rule. *Id.* at 512–13. The Second Circuit "assume[d] plaintiffs' view of the Agreement as primarily horizontal, rather than vertical" and found that the *per se* rule was not applicable. *Id.* at 513–16. The court held that the agreement was "clearly not a territorial or customer allocation because

11

the record reveals no geographic or market division." *Id.* at 515. Similarly, the court reasoned that the agreement is not an allocation of suppliers, *i.e.*, insurance agents, because "the facts do not bear this interpretation; the Agreement permits transfers, and experienced NML agents do not comprise the entire set of suppliers of their services." *Id.* Moreover, the court stated that "while the Agreement may constrain General Agents to some degree, it does not allocate the market for agents to any meaningful extent." *Id.* The court also found that the agreement was not a group boycott and therefore, the rule of reason applied. *Id.* at 515–16.

Indeed, in light of the Second Circuit's analysis in *Bogan*, in *United States v. DaVita Inc.*, the court included jury instructions that stated "a horizontal market allocation requires cessation of 'meaningful competition' in the allocated market" and required the government to "prove actual employee allocation (or, in this case, a conspiracy to actually allocate)." No. 1:21-cr-00229-RBJ, 2022 WL 1288585, at *3 (D. Colo. Mar. 25, 2022). The court also stated that the defendants could not "disprove the government's case by showing that switching employers is theoretically possible or occurred in a few exceptional cases." *Id.*

Here, the Government has not cited,[2] and the Court has not been able to identify, any meaningful difference between this case and *Bogan*.[3] More specifically, even assuming the

---

[2] The Government contends that the Second Circuit found that the agreement in *Bogan* was intrafirm, whereas here, the agreement is interfirm. Opp'n at 8. This aspect of the *Bogan* decision related not to the market allocation discussion, but instead to the group boycott discussion. 166 F.3d at 515–16. Indeed, the Government makes the same argument as to the Second Circuit's discussion of defining a market. Opp'n at 8–9 (arguing that the statement in *Bogan* that "it is an element of a *per se* case to describe the relevant market" was made in the "discussion of whether the challenged group boycott had obvious anticompetitive effect[s] on the market" and the statement "does not address *per se* conduct such as market allocations" (citations and quotation marks omitted)). Moreover, the court in *Bogan* explicitly held that it would have come to the same decision even if the agreement was interfirm. 166 F.3d at 515–16. Therefore, the interfirm-intrafirm distinction is not meaningful.

[3] While the Court distinguished *Bogan* in its Ruling and Order on the motion to dismiss, MTD Order at 21 & n.2, the Court did not—because it could not—review any of the alleged facts. Instead, the Court found that *Bogan* was "distinct from the agreement alleged" in the Indictment because the Indictment alleged that the purpose of the agreement was to suppress wages by preventing workers' mobility. *Id.* at 21–22. Moreover, the Court noted that the agreement in *Bogan* did not "allocate the market . . . to any meaningful extent," and "permit[ted] transfers" *Id.* at 21 n.2. There were no facts in the Indictment that would have suggested that the alleged agreement did not actually

12

Government has proved that there was an agreement between Defendants to restrict hiring and assuming that the Government has submitted sufficient evidence of the relevant market—engineers or other skilled labor employees at QuEST, Belcan, Cyient, PSI, and Agilis working on projects for Pratt & Whitney—as in *Bogan*, where "active [district and sales] agents could not transfer between General Agents without the permission of both the agent's former and future General Agent" and "agents who are terminated by a General Agency will not automatically be prevented from contracting with another General Agency" unless they were fired for cause, 953 F. Supp. at 538 (cleaned up), this alleged agreement "does not allocate the [relevant labor] market . . . to any meaningful extent." *Bogan*, 166 F.3d at 515.

For example, the alleged agreement allowed Pratt to hire from QuEST if Mr. Patel and QuEST agreed on a case-by-case basis. Mr. Patel regularly requested permission to hire employees from QuEST, which representatives from QuEST would grant or deny depending on the circumstances. *See* Gov. Exs. 105 (Mr. Patel requesting concurrence to hire from QuEST in March 2015), 112A (Mr. Patel requesting concurrence to hire from QuEST in June 2015), 151 (Mr. Patel requesting concurrence to hire from QuEST in January 2016), 266 (Mr. Patel confirming that Pratt & Whitney can move forward with hiring a prior QuEST employee in January 2017), 400 (Mr. Patel requesting concurrence to hire from QuEST in August 2017), 407A (Pratt and Whitney requesting concurrence to interview a QuEST employee in July 2017). Mr. Lavoie confirmed this aspect of the agreement in his testimony when he stated that Mr. Patel had the authority to "approve" hiring requests. Tr. Vol. II at 297–98.

---

allocate the market to a meaningful extent and therefore, the *Bogan* analysis did not apply. Now, however, with a full factual record, the Court can properly assess whether the agreement meaningfully allocates the market such that this no hire agreement is one that operates as a market allocation agreement and justifies *per se* treatment. *Id.* at 21 ("Nonetheless, not all no poach agreements are market allocations subject to *per se* treatment and therefore, determining whether a no poach agreement is a market allocation is highly fact specific.").

13

Making all reasonable inferences in favor of the Government, as the Court must at this stage, this evidence, at best, suggests that under the agreement, Mr. Patel could hire from QuEST, if he obtained permission from QuEST.

Additionally, the restrictions shifted constantly throughout the course of the conspiracy. *See, e.g.*, Tr. Vol. VII at 1433–36 (Mr. Hellreich testifying that he understood, based on review of an e-mail received from Mr. Prus on September 9, 2016, that PSI "should not actively recruit candidates from Belcan or Agilis for three to six months," but he could not recall the specific hiring instruction "because it would change"); *Id.* at 1490 (Mr. Hellreich agreeing on cross-examination that the hiring restrictions at PSI "were constantly changing" and "[t]here was no blanket no-hire rule"); Tr. Vol. V at 1124–25 (Mr. Gesner testifying that by 2017 it was "frowned upon" at Belcan to invasively solicit other employees working on Pratt projects by "waiting for them to get out of work" but before 2017 there were no restrictions); *Id.* at 1114–16 (Mr. Gesner testifying that he received instructions not to hire "anyone supporting Pratt" from "mid-2018 to sometime the end of or 2019 to '20"); Tr. Vol. VIII at 1707, 1724–25 (Mr. Sutera testifying that following a Cyient hire of a Quest employee in 2015 he told his recruiting team to "pass on candidates who worked at Quest," but later agreeing that Cyient hired "whoever [it] needed when [it] really needed them" and that the only directive he received from Defendant Edwards was to "hire whoever we need"); Tr. Vol. XII at 2661 (Ms. Craycraft[4] testifying that she did not believe she was operating under any hiring restrictions concerning QuEST until

---

[4] Ms. Craycraft testified to somewhat broad hiring restrictions at Agilis that required her to screen out Belcan and PSI applicants for some period of time between 2011 and 2019, as well as QuEST employees beginning in 2017, and Cyient employees in 2019. *See generally* Tr. Vol. XII at 2604–43. Nonetheless, she could not connect this hiring directive to any Defendant except for a single e-mail from Mr. Edwards in late 2019. Tr Vol XII at 2635–2637 (describing Government's Exhibit 16A); Tr. Vol. XII at 2651–52 (stating that she did not know who Mr. Wasan was); Tr. Vol. XII at 2675 (stating that she did not know who Mr. Houghtaling was); Tr Vol XII at 2710–11 (stating that she had met Mr. Prus once at a supplier summit). She did not address Mr. Patel or Mr. Harvey at all during her testimony.

14

either 2017 or 2018); *Id.* at 2631 (Ms. Craycraft testifying that she only started "to screen out" Cyient applicants to Agilis jobs in September of 2019); Tr. Vol. II at 309–15 (Mr. Lavoie testifying that Pratt and Whitney's policy about hiring from QuEST changed between 2015 and 2016, that there were "periods of time" where Pratt was not hiring from QuEST, and that sometimes they would "freeze" hiring for the remainder of a calendar year[5]); Tr. Vol. X at 2221:4–24 (Ms. Nelson stating that as a Cyient recruiter she saw resumes from Belcan, QuEST, and PSI and that Cyient hired from these companies, but did not always hire from them); Tr. Vol. VIII at 1874 (Mr. Gardner testifying that he told Mr. Patel that "if [he] saw a resume" from a supplier company "that Agilis would have to make a determination of whether or not we were going to hire that person or not"); Tr. Vol. XII at 2705 (Mr. Macauley testifying that Belcan communicated to Mr. Patel that they would not "cold call" candidates from other suppliers but that they would review and consider candidates that applied to Belcan).

Assuming that these shifting hiring restrictions are part of the overarching agreement, they suggest that often hiring was permitted, sometimes on a broad scale. *See, e.g.*, Tr. Vol. XII at 2631 (Ms. Craycraft testifying that she only started "to screen out" Cyient applicants to Agilis jobs in September of 2019); Tr. Vol. VIII at 1724 (Mr. Sutera agreeing on cross-examination that the only hiring directive Mr. Edwards gave him was "[h]ire whoever we need").

---

[5] The only evidence that there were any year-long "freezes" in hiring between Pratt and QuEST relates to 2016, when QuEST requested a "freeze" in direct response to Pratt and Whitney hiring 48 QuEST employees during the prior calendar year which "affected them financially" such that QuEST "had difficulty supporting P&W customers." Tr. Vol. II at 315–16; Gov. Ex. 154. Even during hiring "freezes," however, Mr. Lavoie testified that there would still "be some limited exceptions" and that Mr. Patel would decide whether there was an exception. Tr. Vol. II at 317. Similarly, Mr. Lavoie testified to a "freeze" from September 2017 until the end of the 2017 calendar year. *Id.* at 320–21; Gov. Ex. 12 (Mr. Patel asking a human resources employee to not hire QuEST outsource employees from September 2017 until the end of 2017 because "[y]ear to date, we have hired 44 QuEST employees"). Mr. Lavoie testified that there were no such hiring freezes with respect to Belcan, Cyient, Agilis, or PSI. Tr. Vol. II at 326.

There were statements in e-mails suggesting a blanket agreement not to hire. *See, e.g.*, Gov. Exs. 168A (Mr. Patel stating that Pratt and Whitney "agreed with Quest that P&W will not hire any Quest employee (irrespective of length of service) in 2016"), 17B (Mr. Patel stating that PSI should "not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war"). The alleged agreement, however, allowed for exceptions that were regularly used even during periods of hiring "freezes," such as the exception that a supplier company could hire engineers and other skilled laborers if they separated from their prior employer. *See, e.g.*, Tr. Vol. II at 158 (Ian Inferrera stating he was hired by Pratt during 2016); Gov. Ex. 208 (Mr. Dalal stating in April of 2016 that Pratt could hire Ian Inferrera because he was not a QuEST employee at the time); Tr. Vol. III at 642 (Jordan Salvatore stating that he started at Pratt in April of 2017); Tr. Vol. X at 2266 (Natalie Gill stating she was hired by Pratt in April of 2016 after moving from QuEST to MTU).

This exception was not a secret to Defendants and was often used by the same Defendants who made unequivocal statements about a blanket agreement. *See, e.g.*, Gov. Ex. 208 (Mr. Dalal stating in an April 2016 e-mail, copying Mr. Patel, that Pratt could hire Ian Inferrera because he was not a QuEST employee at the time), Tr. Vol. V at 1117:6–25 (Mr. Gesner testifying that in mid-2018, while he worked at Belcan, there was a directive from Pratt and Whitney "that [he] could go through the [hiring] process with the candidates" from supplier companies "but ultimately they would have to be separated" before he could extend an offer); Gov. Ex. 16A (Mr. Edwards stating in September 2019 that he "flat out ask[s] our teams not to hire people from other Pratt suppliers"); Tr. Vol. VIII at 1724 (Mr. Sutera agreeing on cross-examination that the only hiring directive Mr. Edwards gave him was "[h]ire whoever we need"); Tr. Vol. VIII at 1787–88 (Mr. Gardner stating that Mr. O'Neill and Mr. Patel directed

16

him to not "look at or take into account people who were working at other suppliers" when he reviewed applications to Agilis); Tr. Vol. VIII at 1874 (Mr. Gardner stating that he told Mr. Patel that "if [he] saw a resume, that Agilis would have to make a determination of whether or not we were going to hire that person or not").[6]

Under these circumstances, the alleged agreement itself had so many exceptions that it could not be said to meaningfully allocate the labor market of engineers from the supplier companies working on Pratt and Whitney projects. Therefore, as was the case in *Bogan* where the agreement allowed hiring if the General Agents gave permission and allowed hiring if the sales and district agents were terminated (unless such termination was for cause), the agreement here, "while [it] may constrain" the applicants "to some degree, it does not allocate the market for" engineers or other skilled laborers from the supplier companies working on Pratt and Whitney projects "to any meaningful extent." 166 F.3d at 515.

Indeed, many engineers or other skilled laborers were hired between and among the supplier companies during the relevant time period. For example, in September of 2015, after Mr. Patel requested QuEST's concurrence on Pratt hiring a QuEST engineer, Mr. Wasan responded with a list of engineers that Pratt had hired in just the prior 14 months, which included 41 people. *See* Gov. Ex. 125A. And all but one of the engineers who testified during the

---

[6] The only other non-specious way to view this evidence is that Mr. Patel told certain Defendants that he agreed to a blanket no hire restriction, but then Defendants did not abide by it. The only reasonable inference from this evidence, given the lack of evidence in the record of an explicit agreement, would be that there was no meeting of the minds. *See Valle*, 807 F.3d at 513 ("[S]pecious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty.") (citation and internal quotation marks omitted).

Even if the most favorable non-specious way to interpretate this evidence was as evidence of a blanket no hire agreement that Defendants, including Mr. Patel himself, at times did not follow, this would be insufficient to show a market allocation because there is little to no evidence to show that these periods of "blanket" no hire agreements or hiring freezes included all Defendants and lasted for a significant period of the alleged conspiracy. *Infra* pp. 14 n.3 (describing the evidence of a 2016 year-long hiring freeze and a three-month 2017 hiring freeze, both of which only involved Pratt hiring from QuEST and allowed for exceptions).

17

Government's case-in-chief now work at one of the companies that they had applied to during the time period of the alleged conspiracy. *See, e.g.*, Tr. Vol. II at 158 (Ian Inferrera stating he was hired by Pratt during 2016); Gov. Ex. 208 (Mr. Dalal stating in April of 2016 that Pratt could hire Ian Inferrera because he was not a QuEST employee at the time); Tr. Vol. III at 642 (Jordan Salvatore stating that he started at Pratt in April of 2017); Tr. Vol. X at 2266 (Natalie Gill stating she was hired by Pratt in April of 2016 after moving from QuEST to MTU).

Hiring among the relevant companies was commonplace, throughout the alleged agreement. "[S]witching employers" was not just "theoretically possible" or something that "occurred in a few exceptional cases." *DaVita*, 2022 WL 1288585, at *3. In light of the binding Second Circuit law, and making all reasonable inferences in favor of the Government, the agreement here cannot be said to "allocate the market . . . to any meaningful extent," *Bogan*, 166 F.3d at 515, and therefore, it is not a market allocation agreement as a matter of law.[7] Even if this was not the case, no reasonable juror could conclude that there was a "cessation of 'meaningful competition' in the allocated market." *DaVita*, 2022 WL 1288585, at *3.

---

[7] To the extent that the Government is arguing that the Court is "[g]raft[ing] [n]ew [e]lements onto [p]er [s]e [o]ffenses," that is not the case. Opp'n at 5. The Court is simply requiring the Government to prove that the defendants "intentionally engaged in a conspiracy to" allocate the labor market of supplier companies' engineers working on Pratt and Whitney projects. *Aiyer*, 33 F.4th at 124; *see also id.* at 113–14 ("The selection of the proper mode of antitrust analysis is a question of law, which [circuit courts] review de novo." (quoting *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1124 (9th Cir. 2011)). The Court is also not adopting "a different view of its clear ruling denying the motion to dismiss or in its proposed post-trial jury instructions," as the Government suggests. Opp'n at 9. If anything, the Government has tried to expand the common and accepted definition of market allocation in a way not clearly used before. *See Leegin*, 551 U.S. at 886–87 (limiting the use of the *per se* to situations where the "courts have had considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason.") (internal citations omitted); *see also DaVita*, 2022 WL 1288585, at *2 ("By contrast, the government admits that this is among the first ever criminal prosecutions for allocating a labor market."). *Cf. Valle*, 807 F.3d at 528 (noting that courts "are obligated to construe criminal statutes narrowly so that Congress will not unintentionally turn ordinary citizens into criminals" (citations and internal quotation marks omitted)).

Accordingly, Defendants' motion for judgment of acquittal will be granted on these grounds.[8]

## IV. CONCLUSION

For the foregoing reasons, the Defendants' joint motion for judgment of acquittal is **GRANTED**.

The Clerk of Court is respectfully directed to enter judgment of acquittal for each of the Defendants.

**SO ORDERED** at Bridgeport, Connecticut, this 28th day of April, 2023.

/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

---

[8] Because the Court finds that this issue is dispositive, the parties' arguments about other issues are denied as moot.